IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| APEX MANAGEMENT GROUP I, INC. and JEFFREY BEMORAS, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 24 C 7746 |
| v. | ) ) ) | Judge Robert W. Gettleman |
| VERDEGARD ADMINISTRATORS, LLC, f/k/a Hawaii Mainland Administrators, LLC; REGIONAL CARE, INC.; and DWS HOLDINGS, LLC, d/b/a Pinnacle Peak Administrators, | ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Apex Management Group I, Inc. and Jeffrey Bemoras have sued defendants Verdegard Administrators, LLC, Regional Care, Inc., and DWS Holding, LLC ("Pinnacle"), seeking indemnification and contribution under Section 502(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"). According to plaintiffs' operative Third Amended Complaint: Apex develops and markets self-funded health benefit plans to employers; Bemoras is Apex's principal and is responsible for Apex's relationships with plan clients and service providers, including third-party administrators; and defendants entered into administrative agreements with Apex to be third-party administrators for some of Apex's plans. Plaintiffs allege that the U.S. Department of Labor has sued plaintiffs in a separate lawsuit for breaching their fiduciary duties under ERISA. Plaintiffs have in turn sued defendants in this case for indemnification and contribution, alleging that if plaintiffs are liable, defendants are liable as cofiduciaries.

Plaintiffs assert five counts: a claim by plaintiffs against Verdegard for "Equitable Indemnification and Contribution under ERISA 29 U.S.C. § 1132(a)(3)" (Count I); the same claim by Bemoras against Pinnacle (Count II); the same claim by Apex against Regional (Count III); a claim by Bemoras against Regional for "Equitable Indemnification and Contribution under ERISA" (Count IV); and a claim by Apex against Verdegard for "Breach of Contract" (Count V). Regional has moved to dismiss Counts III and IV under Fed. Rs. Civ. P. 12(b)(1) and 12(b)(3) based on its assertion that plaintiffs must arbitrate their claims, and "alternatively," under Rule 12(b)(6), based its assertion that plaintiffs' claims are barred by the doctrine of unclean hands. Pinnacle has moved to dismiss Bemoras's Count II under Rules 12(b)(1), (3), and (6). For the reasons below, the court denies Regional's and Pinnacle's motions to dismiss.

## BACKGROUND

Plaintiffs allege the following facts in their complaint. Apex is an Illinois corporation that develops and markets to employers self-funded health benefit plans ("Participating Plan(s)"), which typically provide limited coverage for preventive and routine medical care benefits. Each Participating Plan is administered by a third-party administrator. Bemoras "is the principal of Apex and is responsible for Apex's relationships with plan clients and service providers, including third-party administrators."

Regional and Pinnacle are two of those third-party administrators. Regional is a Nebraska corporation, and in 2017, it entered into an Administration Agreement with Apex ("2017 Regional Agreement") (attached to the complaint). "This agreement remained in place until it was replaced with a new agreement, effective June 1, 2023" ("2023 Regional Agreement") (attached to the complaint). Pinnacle is a Washington LLC with its principal place

2

of business in Washington.   In 2020, it entered into an Administration Agreement with Apex (the "2020 Pinnacle Agreement") (attached to the complaint).

In 2024, the DOL sued plaintiffs in Su v. Apex Mgmt Group I and Jeffrey Bemoras, Case No. 24-cv-3609, alleging that Apex and Bemoras breached fiduciary duties under ERISA. According to the Su complaint (attached to plaintiffs' complaint), medical claims under Participating Plans "are supposed to be funded through the financial contributions of the employers and its employees."   But, the DOL alleges, "[b]ecause these contribution rates are artificially low, . . . many Participating Plans . . . do not have enough funds left to pay all their medical benefit claims."   "The proper solution to this funding shortfall is simple: a self-funded plan is responsible for paying all claims, so Apex should seek additional contributions from the employers to cover the unfunded benefit claims."   But instead of doing that, "Apex—through its principal, [Bemoras]—has directed its third-party administrators to pay the claims of underfunded Participating Plans."   "[F]rom at least April 2018 through December 2020, Apex and Bemoras directed and caused the transfer of more than $2.7 million from Participating Plans to pay the claims of unrelated Participating Plans."

The Su complaint further alleges: that Regional "receives and retains all contributions in separate accounts for each Participating Plan it administers"; that when a Regional-Participating Plan has inadequate funds, Apex and Bemoras direct Regional to transfer "assets of other, unrelated Participating Plans—including both active and terminated Participating Plans—to the claims funding accounts of the underfunded Participating Plans and uses those funds to pay the claims."

The Su complaint also alleges: that Pinnacle "receive[s] and retain[s] all contributions for all Participating Plan[s] [it] administer[s] in a single pooled account," "despite the language in the Adoption Agreements between Apex and the sponsoring employers that provides for segregated trust/bank accounts to be established for each Participating Plan"; that "Pinnacle pay[s] service providers and Apex out of the single pooled account, transfer[s] the remaining funds to a commingled claims funding account, and pay[s] claims of all Participating Plans from it"; that Pinnacle "serviced Participating Plans that had not contributed sufficient money to pay all the claims made by the plans' participants and beneficiaries, resulting in claims funding deficits for those Participating Plans"; and that "Pinnacle paid the claims of underfunded Participating Plans out of the commingled claims accounts."

After the DOL filed the Su complaint, plaintiffs brought the instant case, asserting claims for "equitable indemnification and contribution" under Section 502(a)(3) of ERISA. According to plaintiffs, "[u]nder ERISA, third-party administrators are fiduciaries if they exercise *any* authority or control respecting management or disposition of plan assets, whether or not that authority or control is discretionary." (Cleaned up) (Emphasis in original). Regional and Pinnacle, plaintiffs allege, "exercised authority and control over plan assets for plans that they were administering," and thus were "acting as ERISA fiduciaries for those plans."

As for Regional specifically, Regional "knew that it was administering ERISA plans," and when a plan "had inadequate funds to pay its claims, [Regional] transferred assets of other, unrelated Participating Plans—including both active and terminated Participating Plans—to the claims funding accounts of the underfunded Participating Plans and used those funds to pay the

4

claims." By doing so, plaintiffs allege, Regional both became a fiduciary and breached its fiduciary duties in violation of 29 U.S.C. §§ 1104(a)(1)(A) and 1106(b)(2).

In Count III, Apex asserts a claim against Regional for "Equitable Indemnification and Contribution under ERISA, 29 U.S.C. § 1132(a)(3)," "for conduct occurring before June 1, 2023." According to plaintiffs: the 2023 Regional Agreement includes an arbitration clause; that clause "does not apply to acts or omissions" before June 1, 2023; and so "[c]laims under the 2023 [Regional] Agreement are expressly excluded from this lawsuit" and "Apex reserves the right to arbitrate" them. (Emphasis removed). As for the pre-June 1, 2023 conduct, plaintiffs allege that if Apex is subject to a judgment in the Su case, Regional is "jointly liable by way of indemnification or contribution for its equitable share of the damages relating to its respective fiduciary misconduct prior to June 1, 2023." (Citing Chesemore v. Fenkell, 829 F.3d 803, 812-13 (7th Cir. 2016)).

In Count IV, Bemoras similarly alleges that if he is subject to a judgment in the Su case, Regional is jointly liable "by way of indemnification or contribution." But Bemoras alleges that his claim against Regional "is not limited to fiduciary breaches that occurred before June 1, 2023," because his claim is "not arbitrable," as he "is not a party to the 2023 Agreement, and [he] never agreed to arbitrate his claims against" Regional. (Emphasis removed).

As for Pinnacle, it "was a functional fiduciary" that "knew that it was administering ERISA plans," and "received copies of the individual adoption agreements signed by sponsoring employers that established each Participating Plan." Those "agreements state that 'a segregated trust account/bank account' would be established for the employer sponsor (an[ ] Apex client) 'for the purpose of the administration and funding of the [Participating Plan].'" Under the

adoption agreements, sponsoring employers "remitted payments to Pinnacle," "composed of employer and employee contributions." "But instead of depositing these payments into segregated accounts," Pinnacle deposited the contributions into a "single, pooled account, contrary to the plan documents." Doing so was also contrary to plaintiffs' direction: "Apex and Bemoras directed Pinnacle to establish segregated bank accounts to handle contributions and claims for each Participating Plan" and "provided Pinnacle with copies of the adoption agreements establishing each Participating Plan."

Pinnacle also "transferred the remaining funds to a single, commingled claims funding account, and paid claims of all Participating Plans from it," "[s]ome of" which "had not contributed sufficient money to pay all the claims," "resulting in claims-funding deficits" and in Pinnacle "using the assets of one plan to pay the claims of another plan." As a result, plaintiffs allege, Pinnacle "exercised authority or control over plan assets, making it a fiduciary under 29 U.S.C. § 1002(21)(A)(i)," and "breached its fiduciary duties" in violation of 29 U.S.C. §§ 1104(a)(1)(A) and 1106(b)(2).

In Count II, Bemoras asserts a claim for "Equitable Indemnification and Contribution under ERISA 29 U.S.C. § 1132(a)(3)." According to Bemoras, "[i]n the event" that he is subject to a judgment in the Su case, "Pinnacle is jointly liable by way of indemnification or contribution for its equitable share of the damages relating to its respective fiduciary misconduct." Bemoras further alleges that "[w]hile Apex's claims against Pinnacle are arbitrable, Bemoras's are not": He "is not a party to any contract with Pinnacle, and [he] never agreed to arbitrate his claims against Pinnacle."

## DISCUSSION

Both Regional and Pinnacle move to dismiss the claims against them under Rules 12(b)(1), 12(b)(3), and 12(b)(6).   The court addresses the parties' various arguments in turn.

### Dismissal Based on Ripeness

Pinnacle first argues that Bemoras's claim against Pinnacle must be dismissed as unripe. But in February 2026, the parties in the Su case informed the court that they had reached a settlement in principle in that case.   Plaintiffs and Pinnacle have since stated in their March 19, 2026 status report in this case that they agree that this ripeness "argument is mooted by the settlement."   The court thus denies Pinnacle's motion to the extent it is based on ripeness.

### Dismissal Based on Arbitration Agreements

#### Rules 12(b)(1) and 12(b)(3) are not Proper Procedural Vehicles

Pinnacle and Regional both argue that Bemoras's claims against them should be dismissed under Rules 12(b)(1) and 12(b)(3) because his claims must be arbitrated.   But neither defendant explains how these Rules apply to the arbitration issue.   Nor could they.

As for Rule 12(b)(1), it permits dismissal for lack of subject matter jurisdiction.   Fed. R. Civ. P. 12(b)(1).   But Rule 12(b)(1) is inapplicable because "an agreement to arbitrate does not affect a district court's subject-matter jurisdiction."   Grasty v. Colo. Tech. Univ., 599 F. App'x 596, 597 (7th Cir. 2015); see also Gabbanelli Accordions & Imports, L.L.C. v. Gabbanelli, 575 F.3d 693, 695 (7th Cir. 2009) ("the effect of [an] arbitration clause on [a] lawsuit is . . . not jurisdictional").   As for Rule 12(b)(3), it permits dismissal for improper venue.   Fed. R. Civ. R. 12(b)(3).   But the Seventh Circuit has made clear that "a motion to dismiss under Rule 12(b)(3) is not the proper means of enforcing an arbitration agreement."   Rodgers-Rouzier v. Am. Queen

7

Steamboat Operating Co., LLC, 104 F.4th 978, 984 (7th Cir. 2024). That is because "[v]enue is determined solely by reference to federal law—generally 28 U.S.C. § 1391—not the parties' contractual agreements." Id.

So what should the court do with the motions? In seeking dismissal, Regional relies on the Federal Arbitration Act ("FAA") and Seventh Circuit case law governing what courts should do when "considering a motion to compel arbitration." And Pinnacle cites Smith v. Bd. of Directors of Triad Mfg., Inc., 13 F.4th 613 (7th Cir. 2021), for the proposition that "[t]he liberal federal policy favoring arbitration agreements extends to claims under" ERISA. In Smith, the court "constru[ed]" a motion to dismiss under Rules 12(b)(3) and 12(b)(6) based on an arbitration agreement "as one to compel" arbitration under the FAA, explaining that it "is the substance of a motion that counts, not its label." Smith, 13 F.4th at 618 (cleaned up). The court will therefore construe Regional's and Pinnacle's motions to dismiss under Rules 12(b)(1) and 12(b)(3) as motions to compel arbitration under the FAA.

The FAA applies when written arbitration agreements involve interstate commerce. 9 U.S.C. § 2. Under the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." Id. The FAA thus "reflect[s] both a 'liberal federal policy favoring arbitration,' . . . and the 'fundamental principle that arbitration is a matter of contract.'" AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011) (citations omitted). And so, "if one party to a contract containing an arbitration clause attempts to avoid arbitration and files suit in the district court, the other party may move to stay or dismiss the action on the ground that the FAA requires the

8

arbitration clause of the contract to be enforced." Volkswagen Of Am., Inc. v. Sud's Of Peoria, Inc., 474 F.3d 966, 970 (7th Cir. 2007) (citing 9 U.S.C. §§ 3 & 4).

Often, if a court finds that an arbitration clause should be enforced, it will compel arbitration and stay—not dismiss—the case pending arbitration. And indeed, in Smith v. Spizzirri, the Supreme Court recently held that "[w]hen a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." 601 U.S. 472, 478 (2024). But "[b]y its terms, *Spizzirri* requires a district court to stay a case pending arbitration only when one of the parties has requested such a stay." Nat'l Cas. Co. v. Cont'l Ins. Co., 121 F.4th 1151, 1153 (7th Cir. 2024). None of the parties have done so here. The court consequently further construes Regional's and Pinnacle's motions to dismiss under Rules 12(b)(1) and 12(b)(3) as motions to compel arbitration under the FAA and to dismiss the claims against them.

Compelling Arbitration under the FAA

Under the FAA, a party seeking to compel arbitration "must show three elements: (1) an enforceable written agreement to arbitrate; (2) a dispute within the scope of the arbitration agreement; and (3) a refusal to arbitrate." Wallrich v. Samsung Elecs. Am., Inc., 106 F.4th 609, 617-18 (7th Cir. 2024). Although "the FAA does not provide the evidentiary standard applicable for determining whether to compel arbitration," the Seventh Circuit has "analogized the standard needed to that required at summary judgment." Id. at 618. To that end, "[t]he party seeking to compel arbitration bears the initial burden to show that an arbitration agreement exists." Id. If it does so, the party resisting arbitration bears the burden to identify a triable issue of fact on the existence of the purported arbitration agreement. See Tinder v. Pinkerton

9

Sec., 305 F.3d 728, 735 (7th Cir. 2002). When there are "no factual disputes," the district court decides the issue of whether an arbitration agreement exists "as a matter of law." Domer v. Menard, Inc., 116 F.4th 686, 694 (7th Cir. 2024). As to scope, "once the court finds that there is a valid agreement to arbitrate, the burden shifts to the party opposing arbitration to show that the dispute is not covered by the agreement." Hamera v. Best Buy Co., 790 F. Supp. 3d 664, 678 (N.D. Ill. 2025) (cleaned up).

The parties here do not discuss the third "refusal to arbitrate" factor, but it is plainly met: plaintiffs have refused to arbitrate "given [their] initiation of the current lawsuit." Id. (citation omitted). As for the first two factors, Regional argues that the 2023 Regional Agreement contains an enforceable arbitration clause and that plaintiffs' claims fall within its scope. Pinnacle similarly contends that the 2020 Pinnacle Agreement contains an enforceable arbitration clause and that Bemoras's claim falls within its scope.

In response, plaintiffs do not dispute that Apex and Regional agreed to an enforceable arbitration clause in 2023 Regional Agreement, or that Apex and Pinnacle agreed to an enforceable arbitration clause in 2020 Pinnacle Agreement. But, plaintiffs contend, the claims against Regional do not fall within the scope of the arbitration clause in the 2023 Regional Agreement, and even if they did, Bemoras is not a party to the 2023 Regional Agreement and thus cannot be bound by that clause. And, plaintiffs argue, Bemoras is also not a party to the

10

2020 Pinnacle Agreement and so cannot be bound by the arbitration clause in that agreement. The court agrees with plaintiffs.

### Apex's Claim against Regional

To determine whether a contract's "arbitration clause applies to a given dispute," the court applies "state-law principles of contract formation." Gore v. Alltel Commc'ns, LLC, 666 F.3d 1027, 1032 (7th Cir. 2012). In doing so, the court must remember that there is a "liberal federal policy favoring arbitration," and that arbitration should be compelled "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Id. (cleaned up).

The court finds that Apex's claims against Regional do not fall within the scope of the 2023 Regional Agreement. Plaintiffs and Regional agree that the 2017 Regional Agreement did not include any arbitration clause, while the 2023 Regional Agreement did. That arbitration clause provides, in relevant part:

> 20.01 Arbitration. Any dispute or other matter in question between the Company and the Administrator arising out of, or relating to, the formation, interpretation, performance or breach of this Agreement, whether such dispute arises before or after termination of this Agreement, shall be settled by arbitration. Arbitration shall be initiated by the delivery of a written notice of demand for arbitration by one party to the other within a reasonable time after the dispute has arisen.

The 2023 Regional Agreement further includes a merger or integration clause:

> 24.05 Entire Agreement. This Agreement embodies the entire agreement and understanding between the Parties with regard to the subject matter of this Agreement. All prior negotiations and agreements between the parties hereto relating to the subject matter hereof are superseded by this Agreement, and there are no representations, warranties, understanding or agreements other than those expressly set forth herein. If any part of this Agreement is found to be invalid or unenforceable, the remainder of this Agreement will remain in full force and effect.

Where plaintiffs and Regional part ways is on what effect these clauses have on Apex's claim. Plaintiffs argue that the arbitration clause requires arbitrating any dispute "arising out of,

or relating to, the formation, interpretation, performance or breach of this Agreement," and that "this Agreement" refers to the 2023 Regional Agreement, "which became effective on June 1, 2023." So, plaintiffs contend, "the arbitration clause . . . could not apply to conduct before June 1, 2023, because that conduct would not arise out of or relate to the Agreement." Rather, any "such conduct was governed by the parties' 2017 [Regional] Agreement." Because Apex limited its claim against Regional to "pre-2023 conduct," plaintiffs assert, that claim does not "aris[e] out of, or relat[e] to . . . this Agreement," and Apex's claims are therefore not covered by the arbitration clause.

Regional argues that as a general matter, a new contract between the same parties, covering the same subject matter, merges with and supersedes the earlier agreement. It also contends that the "superseding language" in the integration clause "indicates that all previous agreements between Apex and [Regional] regarding [Regional]'s service as a third-party administrator were superseded by the 2023 [Regional] Agreement." And the "this Agreement" language, Regional contends, "refers to the same activities that are the 'subject matter hereof' the contracts integrated and superseded by the 2023 [Regional] Agreement." Regional asserts that it would be "nonsensical" to read the arbitration clause to "apportion [p]laintiffs' claims before June 1, 2023 to litigation, while apportioning Apex's post-June 1, 2023 claims to arbitration." Regional thus concludes that "[t]he 2023 [Regional] Agreement requires Apex to arbitrate its dispute based on . . . conduct from the onset of their relationship through the adoption of the 2023 [Regional] Agreement."

The court disagrees with Regional. For starters, the arbitration clause here expressly states that it applies to only "[a]ny dispute . . . arising out of, or relating to . . . this Agreement . . .

12

." (Emphasis added). "That limitation is significant, as '[c]ourts construing arbitration clauses have refused to subject claims to arbitration where the claims arise from or relate to conduct occurring prior to the effective date of the agreement, *and* where the clause is limited to claims under '*this* Agreement.'" Austin Freight Sys., Inc. v. W. Wind Logistics, Inc., No. 18 C 4832, 2019 WL 2088056, at *4 (N.D. Ill. May 13, 2019) (quoting TradeComet.com LLC v. Google, Inc., 435 F. App'x 31, 34 (2d Cir. 2011) (emphasis in original)) (collecting cases).[1] "The reasoning" for this "is simple: A dispute cannot 'arise out of' a contract if the contract did not exist when the disputed matter occurred." Id.

The significance of the "this Agreement" language, moreover, is further underscored by contrasting it to the language at issue in cases in which courts have found an arbitration clause applies retroactively. Indeed, the parties in those cases, unlike Apex and Regional here, used language that showed that they "expressly agreed to arbitrate either all claims arising out of their commercial relationship or all claims between them no matter when the claims arose." Id. at *3 (collecting cases). Examples of such retroactive-reaching language include: "any controversy between the parties arising out of plaintiff's business or this agreement"; "any dispute, claim or controversy that may arise between Plaintiff and his customer, or any other person"; "any disputes that may have arisen at any time during the relationship between the parties"; "this agreement applies to all transactions occurring before or after this agreement"; and "all

---

[1] Unlike with Bemoras's claims—where Regional and plaintiffs expressly discuss the possibility that Illinois, Arizona, and Nebraska law could all govern the dispute over his claim— neither party explains which state's law governs the Apex claim. For its part, Regional at least implies that Illinois law governs, but it also cites cases from different jurisdictions. Regardless, neither party argues that any particular state's law would affect the interpretation of the 2023 Regional Agreement.

13

transactions between us or all business with us." Id. (cleaned up). Because the arbitration clause here uses "this Agreement," the clause itself does not support compelling Apex to arbitrate its claims.

Recognizing this, Regional has placed substantial weight on the "superseded" language in the integration clause. But the language cannot bear it.

The "superseded" language is part of a "run of the mill" merger or integration clause. And "a 'run of the mill' integration clause does not serve to take away a party's right to litigate under prior contracts;" it serves "to prevent prior unincorporated agreements from being enforceable in the final contract." Coffman v. Provost * Umphrey L. Firm, L.L.P., 161 F. Supp. 2d 720, 729 (E.D. Tex. 2001); see Sec. Watch, Inc. v. Sentinel Sys., Inc., 176 F.3d 369, 372-73 (6th Cir. 1999) (arbitration clause did not reach disputes arising under earlier agreements even though the most recent agreement contained an integration clause, noting that the "purpose" of "a merger clause is to preclude the subsequent introduction of evidence of preliminary negotiations or of side agreements in a proceeding in which a court interprets the document"); Choice Sec. Sys., Inc. v. AT&T Corp., 141 F.3d 1149 (table) (1st Cir. 1998) (standard integration clause in 1994 contracts did not incorporate arbitration clause into pre-1994 agreements); cf. Rosenblum v. Travelbyus.com Ltd., 299 F.3d 657, 665 (7th Cir. 2002) ("A merger clause, in effect, assures the parties that their entire agreement is memorialized in the written contract, and permits either party to invoke the parole evidence rule to exclude evidence of additional contractual terms not included in the written agreement.").

Aside from the merger clause itself, Regional cites cases for the notion that a new agreement between the same parties on the same subject matter supersedes an earlier agreement.

14

But Regional has not shown that either this general proposition or those cases can be stretched to reach the specific proposition that Regional presses here—that an arbitration clause in a second agreement retroactively imposes new procedural obligations for conduct that occurred during the term of a first agreement, which had no arbitration clause.

Nor does the court find persuasive Regional's assertion that it would be "nonsensical" to split pre-June 1, 2023 claims (for litigation) from its post-June 1, 2023 claims (for arbitration). "[I]t is equally nonsensical to suggest that [Apex] simply would abandon its established right to litigate disputes arising under the pre-[2023] contract[ ]." Sec. Watch, 176 F.3d at 373 (rejecting the defendants' "argu[ment] that it would be nonsensical for the parties to commit disputes arising under the 1994 Agreement to arbitration while permitting disputes arising under the earlier agreements to be litigated").

In sum, the 2023 Agreement cannot force Apex to litigate its claims based on pre-June 1, 2023 conduct.   Although the court is mindful that the law and public policy favor arbitration, "the duty to arbitrate remains one assumed by contract, and [courts] will not compel parties to arbitrate disputes unless they have agreed to do so." Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd., 1 F.3d 639, 641 (7th Cir. 1993).   The court thus denies Regional's motion to compel arbitration as to Apex.

Bemoras's Claims against Regional and Pinnacle

Moving to Bemoras's claims, as explained above, Bemoras alleges in Count IV that his claim against Regional is "not arbitrable" because he "is not a party to the 2023 Agreement, and [he] never agreed to arbitrate his claims against" Regional.   Bemoras similarly alleges in Count II that his claims against Pinnacle are also not arbitrable: He "is not a party to any contract with

15

Pinnacle, and [he] never agreed to arbitrate his claims against Pinnacle." Regional and Pinnacle both disagree, and seek to force Bemoras to arbitrate under their respective agreements. The court finds that neither Regional nor Pinnacle have shown that Bemoras is bound by the arbitration clauses in the respective agreements.

"It is a bedrock principle that an arbitration agreement generally cannot bind a non-signatory." Coatney v. Ancestry.com DNA, LLC, 93 F.4th 1014, 1019 (7th Cir. 2024) (cleaned up). "[C]ourts use the terms 'non-parties' and 'non-signatories' interchangeably to reflect individuals or organizations that were not parties (signatories) to a contract containing a forum selection clause but which are parties to the litigation." Organ v. Byron, 434 F. Supp. 2d 539, 540 n.2 (N.D. Ill. 2005). Here, there is no dispute (1) that Bemoras is not a party (signatory) to either the 2023 Regional Agreement or the 2020 Pinnacle Agreement, or (2) that he signed both agreements on behalf of Apex as Apex's managing principal. And the signature block on both agreements clearly reflects as much.

"Whether an arbitration agreement is enforceable against a non-party," like Bemoras, "is a question governed by traditional principles of state law." Coatney, 93 F.4th at 1019 (cleaned up). And "[s]tate law typically provides only for a handful of limited exceptions to the general prohibition against binding nonsignatories: (1) assumption, (2) agency, (3) estoppel, (4) veil piercing, and (5) incorporation by reference." Id. (cleaned up). Regional and plaintiffs agree here that Illinois (where Apex is incorporated), Arizona (where Apex has a location), and Nebraska (where Regional is incorporated) would recognize the same limited exceptions. Pinnacle and plaintiffs agree that Washington law applies to this issue. And Washington courts similarly recognize that: (1) "[g]enerally, an arbitration agreement binds only the parties to that

16

agreement"; and (2) a "nonsignatory may be bound to an arbitration agreement through contract or agency principles," including "incorporation by reference, assumption, agency, and estoppel." Raven Offshore Yacht, Shipping, LLP v. F.T. Holdings, LLC, 199 Wash. App. 534, 541 (2017). Regional and Pinnacle, as the "part[ies] seeking to compel arbitration," "bear[ ] the burden of demonstrating that one of [these] . . . limited exceptions . . . applies." Meatheney v. Arts Performing Ctr., LLC, No. 21-CV-683-PP, 2023 WL 2877038, at *3 (E.D. Wis. Mar. 10, 2023).

Plaintiffs argue that Regional's opening "brief does not clearly state which of the 'limited exceptions' it is relying on." In reply, Regional clarifies that it is relying on two of them— agency and estoppel. As for Pinnacle, it relies on the agency exception. The court thus begins with the agency exception.

Regional argues that "Bemoras, as Principal of Apex, clearly falls within the agency exception" because "[a] principal of a corporation signing a contract binding the corporation, on the corporation's behalf, is clearly acting as its agent." In support, Regional directs the court to Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc., where the Third Circuit stated: "Because a principal is bound under the terms of a valid arbitration clause, its agents, employees, and representatives are also covered under the terms of such agreements." 7 F.3d 1110, 1121 (3d Cir. 1993). Pritzker, Regional contends, "align[s]" with this case.

Pinnacle also relies on Pritzker—at least indirectly. Pinnacle argues that both federal courts and Washington courts recognize that "[a] company's agent, though a nonsignatory, is bound by an arbitration agreement." (Quoting Raven, 199 Wash. App. at 541). In support of that proposition, the Raven court relied on Pritzker, explaining that the Third Circuit had "not[ed]" in that case that "a company can only act through its employees and 'an arbitration

17

agreement would be of little value if it did not extend to' its agents." Id. (quoting Pritzker, 7 F.3d at 1122 (internal quotations omitted)).

But both Pritzker and Raven are readily distinguishable from the instant case: in neither of those cases did the court force a nonsignatory-plaintiff who resisted arbitration (like Bemoras) to arbitrate against a signatory-defendant (like Regional or Pinnacle). In Pritzker, for example, pension-plan trustees sued several Merrill Lynch defendants—MLPF&S, a MLPF&S broker, and MLAM. Those defendants moved to compel arbitration of the entire dispute based on an arbitration clause that applied to only the trustees and MLPF&S. But the trustees argued that their claims against the broker and MLAM were not subject to arbitration because they were not signatories. The court disagreed, holding that, under traditional agency principles, the nonsignatory-defendant broker could compel arbitration along with her signatory-codefendant because she acted as its agent. Id. at 1121. The court explained that a corporation "can only act through its employees" and that those employees may be "integral to" the alleged "violations of the principal corporation." Id. at 1122 (cleaned up). Indeed, the court noted, "an arbitration agreement would be of little value if it did not extend" to employees. Id. (citation omitted). "The Third Circuit thus recognized the unremarkable proposition that when a claim is brought against a corporate entity subject to a valid arbitration agreement, the company's employees whose conduct gave rise to the claim are also covered 'under the terms of a valid arbitration clause.'" Hetrick Companies LLC v. IINK Corp., 710 F. Supp. 3d 467, 486 (E.D. Va. 2024) (quoting Pritzker, 7 F.3d at 1121).

In Raven, the court invoked that same unremarkable proposition to hold that a nonsignatory-defendant could arbitrate with its signatory-codefendant against a signatory-

18

plaintiff. There, the company FT sued the company Raven and Raven's managing partner—whom FT argued had acted on behalf of Raven—for negligence and other claims related to transporting a yacht. Raven moved to compel arbitration based on an arbitration clause that applied to only FT and Raven. The trial court denied the motion. On appeal, the <u>Raven</u> court reversed, holding that the trial court had erred in doing so because the parties had agreed to arbitrate the issue of arbitrability. 199 Wash. App. at 541. Relevant here, in so holding, the court rejected FT's argument that, because Raven's managing partner never agreed to arbitrate claims against him, the "question of whether [he] is bound by the agreement must be decided by the court." <u>Id.</u> Relying on <u>Pritzker</u>, the court held that there was no dispute that the nonsignatory-defendant managing partner was bound by the arbitration agreement that his signatory-defendant company sought to enforce against the signatory-plaintiff. <u>Id.</u>

So both <u>Raven</u> and <u>Pritzker</u> are "distinguishable because [in those cases], unlike here, it was the non-signatory that sought arbitration against a signatory," and case law "makes clear that it matters whether the party resisting arbitration is a signatory or not." <u>Gilman v. Walters</u>, 61 F. Supp. 3d 794, 804 n.7 (S.D. Ind. 2014) (cleaned up); <u>see id.</u> at 804 (finding that there was no "basis for binding any of the non-signatory" parties resisting arbitration to the arbitration agreement). Neither case, then, supports the proposition "that *any* agreement a principal enters will likewise bind its agents." <u>Hetrick</u>, 710 F. Supp. 3d at 487 (distinguishing <u>Pritzker</u>) (emphasis in original).

"To the contrary, it is a basic principle of agency law that '[w]hen an agent acting with actual or apparent authority makes a contract on behalf of a disclosed principal, . . . the agent is not a party to the contract unless the agent and third party agree otherwise.'" <u>Id.</u> (quoting

19

Restatement (Third) of Agency § 6.01 (2006)).   And it is equally "well-established that signing an arbitration agreement as agent for a disclosed principal is not sufficient to bind the agent to arbitrate claims against him personally."   Gilman, 61 F. Supp. 3d at 804 (cleaned up) (collecting cases)).   "Thus, the mere fact that [Bemoras] signed the Agreement[s] as a known and disclosed agent of [Apex] does not suffice to bind [Bemoras] to th[ose] Agreement[s]."   Hetrick, 710 F. Supp. 3d at 487 (denying signatory-defendant's motion to compel arbitration against the non-signatory-plaintiff, who was the "sole member" of the signatory-plaintiff company).

Here, Pinnacle argues that Bemoras "is a 50% owner of Apex," and that the 2020 Pinnacle Agreement "contemplated an ongoing relationship in which Apex's promises could only be fulfilled by future acts of its employees or agents."   And both Pinnacle and Regional contend that Bemoras is integrally involved in virtually all aspects of Apex's business and is responsible for relationships with administrative providers, including them.   But neither Regional nor Pinnacle has shown that either had agreed with Bemoras that Bemoras would be bound to the respective agreements, or that Apex was empowered to contract on behalf of Bemoras.   The court thus finds that Bemoras is not bound by the arbitration clause in either agreement under the agency exception.

As for the estoppel exception, Regional asserts that "[a] nonsignatory may be compelled to arbitrate only when the nonsignatory (1) knowingly exploits the benefits of an agreement containing an arbitration clause, or (2) seeks to enforce terms of that agreement or asserts claims that must be determined by reference to the agreement."   (Citing Benson v. Casa De Capri Enterprises, LLC, 502 P.3d 461, 464 (Ariz. 2022)).   This is the "direct benefit estoppel" theory. Benson, 502 P.3d at 464.   Although Pinnacle does not explicitly argue for estoppel, Washington

courts also recognize "direct benefits estoppel, which focuses on whether the party opposing arbitration is claiming the contract's benefits while attempting to avoid the arbitration provision in the contract." Patrick v. Ramsey, No. C23-0630JLR, 2024 WL 3914866, at *4 (W.D. Wash. Aug. 21, 2024) (cleaned up).[2] But neither Regional nor Pinnacle have established that direct benefit estoppel applies here.

To begin, neither contends that Bemoras exploited the benefits of the agreements. Nor have either identified a direct benefit that Bemoras allegedly received. Regional instead argues that "without the contract between Apex and [Regional], Bemoras would *have no claims*": "The contracts between Apex and [Regional] created the third-party administrator relationship, and the fiduciary duties which Bemoras asserts [Regional] violated." (Emphasis by Regional). And Pinnacle similarly argues that Bemoras's claim "would not have been possible but for the [2020 Pinnacle] Agreement," that the remedies he seeks are "contract claims," and that his claim necessarily "arise[s] out of and relate[s] to" the 2020 Pinnacle Agreement.

But the court agrees with Bemoras that his assertion here is that Regional and Pinnacle became fiduciaries based on what they did—not on what they contractually promised to do—and that his claims neither seek to enforce the respective agreements nor must be determined by reference to those agreements. Indeed, Bemoras alleges in the complaint: that Regional and Pinnacle "exercised authority and control over plan assets for plans that they were

---

[2] Washington courts further recognize another type of equitable estoppel in the arbitration context: "intertwined claims estoppel, which applies when the claims asserted by the party opposing arbitration are intertwined with the underlying contract obligations." Patrick, 2024 WL 3914866, at *4 (cleaned up). But "intertwined estoppel" generally applies to signatories who sue nonsignatories along with signatories in an attempt to avoid arbitration, id. at *5, and so would not apply in this situation.

administering," and were thus "acting as ERISA fiduciaries for those plans"; and that both breached their duties under 29 U.S.C. §§ 1104(a)(1)(A) and 1106(b)(2). As a result, Bemoras alleges, if he is found liable, Regional and Pinnacle are "jointly liable by way of indemnification and contribution for equitable share of the damages relating to [their] respective fiduciary misconduct" under Section 502(a)(3) of ERISA or Chesemore. So Bemoras is expressly asserting a fiduciary duty arising under ERISA—not the agreements.

In the end, neither Regional nor Pinnacle have met their burden to show that any exception applies to justify binding nonsignatory Bemoras to the respective arbitration clauses.[3] The court therefore denies Regional's and Pinnacle's motion to compel arbitration and to dismiss the claims against them based on their respective agreements with Apex.

### Dismissal Under Rule 12(b)(6)

Regional and Pinnacle also move to dismiss the claims against them for failure to state a claim under Rule 12(b)(6). A motion to dismiss for failure to state a claim under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits. See Gibson v. City of Chi., 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a Rule 12(b)(6) motion, the complaint must provide the defendant with fair notice of a claim's basis and must be facially plausible. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

---

[3] In its opening brief, Regional also pointed to the "closely related" doctrine in support for binding Bemoras. But as Bemoras notes (and Regional does not challenge in reply), "it does not appear that the Seventh Circuit or courts of Illinois, Nebraska or Arizona have applied the 'closely related' doctrine to arbitration clauses"—let alone to situations in which a signatory-defendant seeks to bind a non-signatory-plaintiff corporate officer.

draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

In determining whether a plaintiff has stated a facially plausible claim, "a court may consider, in addition to the allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." Williamson v. Curran, 714 F.3d 432, 436 (7th Cir. 2013). And "a party opposing a Rule 12(b)(6) motion may submit materials outside the pleadings to illustrate the facts the party expects to be able to prove." Geinosky v. City of Chi., 675 F.3d 743, 745 n.1 (7th Cir. 2012).[4]

Regional's Argument for Dismissal

Regional contends that plaintiffs' claims against it must be dismissed based on the equitable doctrine of unclean hands. According to Regional, the unclean hands doctrine "provides that a court will not adjudicate a case if a judgment for the plaintiff would encourage or reward criminal or other unlawful activity." (Cleaned up). Here, Regional asserts, plaintiffs' claims rely on the assertion that Regional breached its fiduciary duties. But, Regional contends, the DOL asserts in its own complaint (which is attached to the operative complaint

---

[4] The court notes that Pinnacle filed its answer to the Third Amended Complaint on the same day that it filed its motion to dismiss under Rule 12(b)(6). "If an Answer is filed before a motion to dismiss, the court treats the motion as one for judgment on the pleadings." Heckler & Koch, Inc. v. Coharie Arms, Inc., No. 1:09-CV-0184, 2010 WL 987747, at *1 n.1 (S.D. Ind. Mar. 12, 2010). But "[t]his is a closer call," because Pinnacle filed its "motion to dismiss and their Answer on the same day." Id. Because the standards for dismissal are "essentially the same" under Rules 12(c) and 12(b)(6), and because "the Answer was technically filed after the motion to dismiss, the court treats the motion as the parties do—as one to dismiss under [Rule] 12(b)(6)." Id.; see also Federated Mutual Ins. Co. v. Coyle Mech. Supply Inc., 983 F.3d 307, 313 (7th Cir. 2020) ("The only difference between a motion for judgment on the pleadings and a motion to dismiss is timing; the standard is the same.").

23

here) that plaintiffs directed the conduct—the improper transfer of funds—that forms the basis of the breach claim. Plaintiffs' claims, Regional therefore concludes, must be dismissed based on plaintiffs' unclean hands.

The court disagrees. Unclean hands "is an affirmative defense and thus is not a proper basis to dismiss a claim by a motion to dismiss unless the face of the complaint shows beyond doubt that an affirmative defense is dispositive." ABN AMRO, Inc. v. Capital Int'l Ltd., 595 F. Supp. 2d 805, 851 (N.D. Ill. 2008) (denying motion to dismiss unjust enrichment claim); Gagliano v. Cytrade Fin., LLC, No. 09-4185, 2009 WL 3366975, at *1 n.2 (N.D. Ill. Oct. 16, 2009) (deeming the affirmative defense of unclean hands "plainly unavailing [as a basis for dismissal] on a motion to dismiss"). Regional has not shown that the face of the complaint shows beyond a doubt that this affirmative defense is dispositive. For example, the DOL's allegations in the Su complaint are not established facts. The court consequently denies Regional's motion to dismiss under Rule 12(b)(6) based on the doctrine of unclean hands.

Pinnacle's Arguments for Dismissal

Pinnacle argues that Bemoras's claim against it must be dismissed under Rule 12(b)(6) for two reasons. The court address each below.

Whether Pinnacle was a fiduciary

Pinnacle first contends that Bemoras's claim should be dismissed because Pinnacle was not a "fiduciary." "In every case alleging breach of ERISA fiduciary duty, the threshold question is whether a person employed to provide services under a plan was acting as a fiduciary, i.e., was performing a fiduciary function, when taking the complained-of action." Howell v. Motorola, Inc., 337 F. Supp. 2d 1079, 1087 (N.D. Ill. 2004). There are "two types of fiduciaries

24

Case: 1:24-cv-07746 Document #: 94 Filed: 06/22/26 Page 25 of 30 PageID #:950

. . . under ERISA: 'named' fiduciaries and 'functional' fiduciaries." <u>Burke v. Boeing Co.</u>, 42 F.4th 716, 725 (7th Cir. 2022). A "named fiduciary" is a person who is "'named in the plan instrument, or who, pursuant to a procedure specified in the plan'" is "given express 'authority to control and manage the operation . . . of the plan.'" <u>Id.</u> (quoting 29 U.S.C. § 1102(a)(1)-(2)). A "functional fiduciary," on the other hand, is a person who might not be named in the plan document but who is still a "fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(i) & (iii).

Here, Bemoras alleges that "Pinnacle was a functional fiduciary" that "exercised discretionary control over the management and administration of the plans, and . . . exercised authority and control over plan assets." In moving to dismiss, Pinnacle first contends that it could not have exercised any control over the "assets" because the plans had no "assets." That is because, it argues, "participant and beneficiary contributions were remitted and distributed either simultaneously or prior to the 90-day deadline," under 29 C.F.R. § 2510.3-102(c). And, Pinnacle continues, "Pinnacle did not have access to information about the source of plan funding . . . because Pinnacle's electronic financial processing platform does not have a discriminator that delineates funding in this way." So, Pinnacle asserts, "Pinnacle would be hard-pressed to exercise authority and control over plan assets, if there were any."

Pinnacle's "assets" argument misses the mark. To start, the complaint plausibly pleads that there were assets. Bemoras alleges in the complaint that employers "remitted payments to

Pinnacle," "composed of employer and employee contributions," and that "instead of depositing these payments into segregated accounts," Pinnacle deposited them into a "single, pooled account, contrary to the plan documents" and to plaintiffs' direction. Pinnacle's own cited case in its reply brief states that a "plans' contributions . . . are 'plan assets.'" Assocs. in Adolescent Psychiatry, S.C. v. Home Life Ins. Co. of New York, 729 F. Supp. 1162, 1180 (N.D. Ill. 1989).[5] Second, Pinnacle's argument relies entirely on factual assertions—without any evidentiary basis—about timing (contributions were remitted and distributed either simultaneously or prior to the 90-day deadline) and knowledge (Pinnacle's access to information). But resolution of such factual assertions is premature at this stage and "must be reserved for a time when a fuller factual record is before" the court. George v. Kraft Foods Glob., Inc., 674 F. Supp. 2d 1031, 1050 (N.D. Ill. 2009) (denying motion to dismiss based on fiduciary issue as premature).

Pinnacle next argues that it was not a fiduciary because it "did not exercise discretionary control over the management and administration of the plans." (Emphasis added). According to Pinnacle: it "is not the named administrator in the plan documents or the plan sponsor"; the 2020 Agreement with Apex did not give Pinnacle any discretion over managing the plans; and the Adoption agreements between Apex and its clients are not binding on Pinnacle. So Pinnacle did not "exercise any discretion in managing the plans and merely followed Plaintiffs' direction."

But Bemoras is not alleging that Pinnacle was a named fiduciary; he is alleging that Pinnacle was a functional fiduciary. And "discretionary control of a [functional] fiduciary" is

---

[5] In its opposition brief, Bemoras attaches the DOL's interrogatory responses from the Su case, arguing that the DOL "has confirmed its position that employee contributions are plan assets." Although the court need not rely on those responses to find the allegations plausibly pleaded, it was not improper for Bemoras to submit them "to illustrate the facts [he] expects to be able to prove." Geinosky, 675 F.3d at 745 n.1.

26

typically a factual issue not "to be determined by a motion to dismiss." Senior Lifestyle Corp. v. Key Benefit Adm'rs, Inc., No. 117-2457, 2017 WL 5483161, at *3 (S.D. Ind. Nov. 15, 2017) (citation omitted) (denying motion to dismiss based on fiduciary issue) (collecting cases). Regardless, Bemoras has at least plausibly pleaded that Pinnacle had control—discretionary or otherwise—over plan assets. See Leimkuehler v. Am. United Life Ins. Co., 713 F.3d 905, 913 (7th Cir. 2013) (explaining that "management or disposition of assets" language in second portion of § 1002(21)(A)(i) does not include a "separate requirement of discretionary authority or control," and so is broader than the first portion of subsection (i) (emphasis added)). Again, Bemoras alleges: that sponsoring employers "remitted payments to Pinnacle"; that Pinnacle deposited the payments into a "single, pooled account, contrary to the plan documents" and to plaintiffs' direction; and that Pinnacle "transferred the remaining funds to a single, commingled claims funding account, and paid claims of all Participating Plans from it," "[s]ome of" which had insufficient money, resulting in Pinnacle "using the assets of one plan to pay the claims of another plan." These allegations are sufficient at this stage to avoid dismissal.

Perhaps sensing this, Pinnacle switches gears in its reply brief, and argues that it could not have exercised control of the assets because it was merely performing "ministerial" tasks at plaintiffs' direction. (Citing Adolescent Psychiatry, 729 F. Supp. at 1180-81). True, the court in Adolescent Psychiatry stated that a party "performing 'ministerial functions' designated pursuant to [a plan] is not an ERISA fiduciary," and that "[a] person does not exercise 'authority or control' over a plan's assets if his actions are entirely directed by another." 729 F. Supp. at 1181. But Bemoras alleges that Pinnacle acted "contrary" to the plans and to plaintiffs' direction, and further, that it was doing more than just ministerial tasks—Pinnacle, he alleges,

27

was "transferring the remaining funds to a single, commingled claims funding account," and "using the assets of one plan to pay the claims of another plan." And notably, Adolescent Psychiatry was decided at a different litigation stage—at summary judgment. Id. at 1166. At this stage, Bemoras has pleaded enough facts to overcome a motion to dismiss.

### Whether Bemoras is entitled to relief under § 502(a)(3)

Pinnacle argues that Bemoras's claim should be dismissed because Pinnacle is not a co-defendant in the underlying Su case, and, Pinnacle contends, the Seventh Circuit permits a court to order indemnification and contribution only among defendants in the underlying case. In response, Bemoras asserts that under Chesemore and Free v. Briody, 732 F.2d 1331 (7th Cir. 1984), an ERISA fiduciary can seek indemnification or contribution against a co-fiduciary, and that nothing in those cases, or in ERISA, "states that a contribution or indemnification claim must be asserted as part of the underlying claim." In reply, Pinnacle cites no case in which a court has held that an indemnification and contribution claim applies only to co-defendants within the same case. But, it argues, that should be the rule as a matter of policy because parties like Pinnacle are not able to defend themselves on the merits against the allegations in the underlying case, and cannot participate in any settlement of the allegations. Pinnacle thus asserts that Bemoras may pursue his claim only through Rule 14 in the Su case.

Pinnacle has not shown that dismissal is warranted on this basis. For one thing, the court finds that Pinnacle's argument is inadequately developed and supported. See United States v. Jones, 224 F.3d 621, 626 (7th Cir. 2000) ("[a]rguments that are not adequately developed or supported are waived"). It also lacks surface appeal.

28

Indeed, Pinnacle concedes that the Seventh Circuit recognizes that ERISA allows indemnification among fiduciaries. See Chesemore, 829 F.3d at 812 (ERISA's equitable remedial scheme permits courts to "apportion the damages equitably between the wrongdoers") (quoting Free, 732 F.2d at 1337)). Neither Chesemore nor Free suggested that an indemnification claim is procedurally limited to being filed via Rule 14 and cannot be brought in a separate lawsuit. And at least the Second Circuit has suggested that a putative co-fiduciary can be sued in a separate lawsuit. See Dardaganis v. Grace Cap. Inc., 889 F.2d 1237, 1241 (2d Cir. 1989) ("To the extent that plan trustees are negligent in enforcing the rights of beneficiaries, they might be subject to separate suit by those beneficiaries or, perhaps, to suit by co-fiduciaries for indemnification or contribution."). Nor has Pinnacle shown that it is being denied the opportunity to defend itself. On the contrary, it can contest fiduciary status and responsibility for any losses in this case—and has started doing just that with its motion here. The court denies Pinnacle's motion to the extent it is based on the claim being brought in a separate suit.

Finally, Pinnacle also contends that Bemoras is "not entitled to the relief [he] seek[s] under ERISA § 502(a)(3)" because he denies that he is a fiduciary, and only fiduciaries can bring a civil action under ERISA § 502(a)(3). The court disagrees. This is another inadequately developed and supported argument—relegated to a couple conclusory sentences. It falls short, anyway. The Federal Rules allow pleading in the alternative. Fed. R. Civ. P. 8. Bemoras couches his claim in the alternative: He alleges that, "[i]n the event" that he is subject to a judgment, "Pinnacle is jointly liable." Pinnacle fails to show that Bemoras is required to admit he is a fiduciary before seeking indemnity from others.[6]

---

[6] Pinnacle placed this argument under the heading in its brief "Dismissal of Plaintiffs' claims is

29

In short, the court denies Pinnacle's motion to dismiss under Rule 12(b)(6).

**CONCLUSION**

For the above reasons, the court denies both defendant Regional's motion to dismiss [70], and defendant Pinnacle's motion to dismiss [73].   Regional is directed to file its answer by July 20, 2026.   The parties are directed to file a joint status report using this court's form on or before July 27, 2026.

So ordered.

**ENTER:**

**Robert W. Gettleman**
**United States District Judge**

**DATE:     June 22, 2026**

---

warranted pursuant to federal rules 12(b)(1) and (3)."   But it has not shown that those rules compel a different result.

30